UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN E. MONTGOMERY,<br><br>                             Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>                            Defendant. | Case No.: 16cv1735 - JLS (PCL)<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE RE:**<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. 25]; and**<br><br>**DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT [Doc. 26]** |

**I. INTRODUCTION**

Plaintiff Sean E. Montgomery has filed a pro se complaint seeking judicial review of Defendant Social Security commissioner Nancy A. Berryhill's denial of his application for Supplemental Security Income and for Disability Insurance Benefits under the Social Security Act. (Doc. 1.) Plaintiff has filed a Motion for Summary Judgment (Doc. 25), and Defendant filed a Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (Doc. 26-1.) For the reasons set forth below, the Court

RECOMMENDS that Plaintiff's motion be DENIED and that Defendant's motion be GRANTED.

## II. PROCEDURAL HISTORY

On June 5, 2007, Plaintiff filed an application for Disability Insurance and Supplemental Security Income pursuant to Titles II and XIV of the Social Security Act, alleging bipolar disorder, phobias, depression, paranoia, suicidal thoughts, insomnia, and physical impairments beginning January 1, 1993. (A.R 256, 322.) Plaintiff's disability onset date was later amended to June 5, 2007. (A.R. 36.) Plaintiff's applications were denied initially and upon reconsideration. (A.R 126-29.) Thereafter, Plaintiff filed a written request for a hearing. (A.R. 140-50.) An Administrative Law Judge ("ALJ") held a hearing on May 26, 2011. (A.R. 49-113.) On July 6, 2011, the ALJ issued a written decision finding Plaintiff not disabled because he could perform a significant number of jobs in the national economy. (A.R. 32-48.) After considering all the evidence in the record as a whole, the ALJ found:

1. Plaintiff's disability onset date was amended to June 5, 2007. (A.R. 36.)
2. Amendment of Plaintiff's disability onset date was appropriate in light of Title XVI eligibility. (A.R. 36.)
3. Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of June 5, 2007. (A.R. 36.)
4. Plaintiff had the following severe impairments: back pain; right elbow, hand, and wrist impairment; nerve damage in the right elbow; gastroesophageal reflux disease ("GERD"); status post right foot fracture; dysthymia or mood disorder NOS; and substance abuse (drugs), by history. (A.R. 36.)
5. Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 37.)
6. Plaintiff retained the residual functional capacity ("RFC") to lift or carry twenty-five pounds frequently and fifty pounds occasionally; stand and/or walk for a total of about six hours out of an eight-hour workday; sit for a total of about six hours out of

an eight-hour workday; is restricted to frequent climbing, balancing, stooping, kneeling, crouching, and crawling; and mentally limited to work with no public contact and minimal contact with co-workers. (A.R. 38.)

7. Plaintiff has no past relevant work. (A.R. 39.)

8. Plaintiff was 41 years old when the application was filed, which is defined as a younger individual age 18-49. (A.R. 39.)

9. Plaintiff has a high school education and is able to communicate in English. (A.R. 39.)

10. Plaintiff's education and training do not permit direct entry into skilled work. (A.R. 40.)

11. Transferability of job skills is not an issue because Plaintiff does not have past relevant work. (A.R. 40.)

12. In light of Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (A.R. 40.)

13. Plaintiff had not been under a disability, as defined in the Social Security Act, from June 5, 2007, through the date of his decision on July 6, 2011. (A.R. 41.)

On January 29, 2013, the Appeals Council denied Plaintiff's request to review the ALJ decision, making the ALJ's decision the Commissioner's final decision. (A.R. 26-29.) Plaintiff then filed a federal complaint on July 1, 2016, seeking judicial review of the Commissioner's decision. (Doc. 1.)

### III. ADMINISTRATIVE RECORD

A. Psychological Evidence

    1. Prison and Parole Records

Chronological Interdisciplinary Progress Notes ("chronos") from August 9, 2008 to May 8, 2007, detail Plaintiff's treatment while incarcerated before the alleged onset date of Plaintiff's disability. (A.R. 437-63.) These treatment notes contain summaries of brief interactions with Plaintiff on a semi-regular basis. Plaintiff had a consistently moderate

3

16cv1735 - JLS (PCL)

treatment plan throughout this time and the records show no significant increase in either treatment frequency or medication. (Id.)

Frequently, these treatment notes tie Plaintiff's mood and affect to the prison's efforts to move Plaintiff out of his secure housing unit, where he lived alone, and into housing with a cellmate. (A.R. 442, 447-48, 453-55, 457-63.) Plaintiff indicated that he had a previous experience with a "cellie" where the individual attacked him in his sleep and he had to "beat him down badly" in an effort to defend himself. (A.R. 454.) Plaintiff worried that having to live with a cellie again would create a potential conflict that Plaintiff wanted to avoid given that he already had two strikes and a third would destroy his chances of being released in July, 2007. (Id.) Plaintiff often engaged in hunger strikes as a way of challenging his housing transfer. (A.R. 457-58, 460, 463.)

Plaintiff's treatment notes indicate that Plaintiff had bipolar disorder "by history," however none of the chronos provide an original diagnosis. (A.R. 437-63.) His behavior was always within normal limits and Plaintiff never demonstrated either suicidal or homicidal ideations, however Plaintiff did display a consistent fear of bugs. (Id.) On December 5, 2006, a psych evaluation was requested after staff discovered while reviewing outgoing mail that Plaintiff wrote he was going to commit suicide. (A.R. 453.) Plaintiff reaffirmed the intention over the phone to his sister. (Id.) The clinical psychologist who attended to Plaintiff found him calm, alert, oriented to time, place person and situation, and cooperative. (Id.) Plaintiff told the psychologist that his behavior was an attention seeking device in order to not be moved in with a cellmate. (Id.) During this conversation Plaintiff denied any current suicidal ideation, indicated that he would likely hunger strike, and the psychologist deemed Plaintiff not suicidal. (A.R. 454-55.)

Client Episode Profile (Parole) records for Plaintiff detail information relayed following Plaintiff's release from Prison on May 10, 2007. (A.R. 476-87.) Plaintiff indicated he had been incarcerated many times, frequently for burglary and that he had a long history of substance abuse, going back to age fifteen, starting with PCP and later preferring cocaine. (A.R. 481.) Plaintiff indicated that he last used cocaine in 2001. (Id.)

Plaintiff also indicated that while in prison he was diagnosed with bipolar disorder and that he was taking Pisperidone, Wellbutrin, and Benadryl for his mood swings. On June 12, 2007, Plaintiff described himself as "moody" and reported that his elevated moods are "more up than normal." (A.R. 485.) The clinician noted that Plaintiff's description of "up" does not describe mania or hypomania, but rather "just very energetic as compared to when he's depressed." (Id.) Notes also indicated that Plaintiff was enrolled at City College and hoping to find part-time work. (A.R. 486.)

The June 18, 2007 case note indicates Plaintiff has cocaine dependence in remission and the assessment and plan calls for ruling out the possibility of a substance induced mood disorder and malingering of mental illness for secondary gain. (A.R. 481-82.) Plaintiff also provided his class schedule, as he would be missing weekly sessions, instead attending classes full time. (A.R. 481.) Additionally, the clinician noted that "[i]t has been very obvious during the interview that [Plaintiff] was more focused [on] how to get SSI rather than address any mental health issues." (Id.)

Parole records from September 2010 indicate that following a twenty-six month period of incarceration, Plaintiff was transient and looking for housing. (A.R. 645-47.) Notes indicate that at this time Plaintiff "denied current mental health symptoms." (A.R. 646.)

### 2. Evaluating and Consulting Physicians

Plaintiff's mental health impairments were evaluated by Luyen T. Luu, M.D., on November 2, 2007. (A.R. 491-501.) Using the SSA's Psychiatric Review Technique form, Dr. Luu was unable to make a determination of Plaintiff's disposition because there was insufficient evidence. (A.R. 491.)

On August 31, 2010, Dr. K. Loomis, M.D. completed another Psychiatric Review Technique form and determined that Plaintiff's impairments were not severe. (A.R. 620-30.) Dr. Loomis reviewed Plaintiff's records to evaluate whether Plaintiff's impairments met or equaled listing 12.04: Affective Disorder. (A.R. 620.) Dr. Loomis determined that a medically determinable impairment was present that does not precisely satisfy the

diagnostic criteria for 12.04. (A.R. 623.) Dr. Loomis, in evaluating Plaintiff's functional limitations, determined that Plaintiff experienced mild limitations in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (A.R. 628.) Dr. Loomis also noted that Plaintiff had no repeated episodes of decompensation. (Id.)

### B. Medical Evidence

#### 1. Plaintiff's Provided Records

Records from a MRI on October 7, 2009, indicate that Plaintiff was diagnosed with minimal multilevel spondylosis but without a focal disc herniation, spinal stenosis, or foraminal narrowing, the cause of his lower back pain. (A.R. 610.) Plaintiff's pain was treated with Neurontin and at an appointment on January 11, 2010, he was also instructed to perform back exercises for ten minutes, twice daily. (A.R. 586.) Plaintiff's records indicate that similar treatment was recommended on February 18, 2010 and March 22, 2010. (A.R. 580, 583.) The March 22 note also indicates that Plaintiff was unable to get Tylenol #3 because a policy prohibited prescriptions in excess of ten days. (A.R. 580.) In May 2010, Plaintiff reported that his back pain was well controlled with Neurontin and an over the counter pain reliever (naprosen). (A.R. 575.) The clinician recommended Plaintiff take naprosen thirty to sixty minutes before exercising. (Id.) Plaintiff indicated his pain was a three to five (presumably out of ten) with his current regimen and that he had minimal interference in his functional activities. (Id.)

An orthopaedic surgery record from October 9, 2009, shows that Plaintiff was suffering from a ganglion cyst in his right wrist. (A.R. 612.) The record indicates that this was not the first cyst Plaintiff had. (Id.) Because an aspiration would have been dangerous given proximity to the radial artery, the surgeon recommended an excision. (Id.) The cyst was successfully excised on November 12, 2009. (A.R. 590-91.) Plaintiff complained of numbness in his fourth and fifth fingers as a result of the excision at an appointment in January 2010. (A.R. 586.) Plaintiff was still experiencing numbness in February 2010 and

6

16cv1735 - JLS (PCL)

his doctor recommended Plaintiff wear a wrist splint, which he received in March 2010. (A.R. 583, 586.)

The progress note from May 2010 reports that Plaintiff suffered a volar plate fracture of his middle phalanx right middle finger. (A.R. 574, 611.) The note indicates that Plaintiff injured his finger playing basketball two or three months before the May 20 appointment. (Id.)

2. Evaluating and Consulting Physicians

On November 29, 2010, Plaintiff was examined by Dr. Thomas Sabourin, M.D., who provided a medical source statement. (A.R. 658-62.) Dr. Sabourin noted that Plaintiff's social history did not include drug use, but that Plaintiff smoked upwards of half a pack of cigarettes a day. (A.R. 659.) The statement indicates that Plaintiff sits and stands with normal posture, without evidence of a tilt or list, and sits comfortably. (Id.) Plaintiff was able to rise from a chair without difficulty and used no assistive device except for the splint on his right wrist. (Id.) Dr. Sabourin noted that while Plaintiff's neck range of motion is normal, he does experience pain with right lateral flexion. Plaintiff demonstrated no tenderness in his neck but did have neck pain with axial loading. (Id.) Additionally, Plaintiff's back range of motion was normal, but he had pain with full flexion. (A.R. 660.)

Dr. Sabourin indicated that Plaintiff's range of motion of the wrists was grossly normal and painless. (A.R. 660.) His wrists were without tenderness, warmth, crepitus, instability, or swelling. (Id.) Dr. Sabourin did note that Plaintiff had well-healed volar and dorsal scars on the right wrist, though there was no instability. (Id.) Plaintiff's range of motion was grossly normal and painless in his shoulders, elbows, wrists, hands and fingers, hips, knees, ankles, and feet. (Id.)

From his examination, Dr. Sabourin produced the following diagnostic impression: 1) Status post excision of right wrist ganglion cyst; 2) Mild irritation of the right antebrachial cutaneous nerve, right arm; 3) Lumbar strain and sprain with minimal degenerative changes on MRI; 4) Status post right foot fifth metatarsal base fracture, healed; and 5) Fracture of the right long finger volar plate at the middle joint, well-healed

with full range of motion. (A.R. 661.) Dr. Sabourin indicated that Plaintiff's severity and duration of his complaints is disproportionate to Plaintiff's determinable condition. (A.R. 662.) There was no discernable reason why Plaintiff would need to continue using the wrist splint and he displayed no weakness or neurological deficit. (Id.) With regard to Plaintiff's back pain, Dr. Sabourin indicated that Plaintiff has nominal changes on MRI and a full range of motion without neurological deficit or atrophy. (Id.) Dr. Sabourin concluded his discussion by stating that "[i]n general, [Plaintiff] is doing quite well at this time." (Id.)

Dr. Sabourin indicated that Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently; could stand and walk for six hours in an eight-hour workday and could sit for the same amount of time. (A.R. 662.) Plaintiff's push and pull limitations were equal to his lift and carry limitations, and Plaintiff would be able to climb, stoop, kneel, and crouch frequently. Dr. Sabourin indicated that Plaintiff had no manipulative limitations and no need for assistive devices. (Id.)

Medical Consultant J. Ross, M.D., completed a Physical RFC Assessment on December 1, 2010. (A.R. 665-70.) In terms of exertional limitations, Plaintiff was limited to occasionally lifting fifty pounds and frequently lifting twenty-five pounds. (A.R. 666.) Plaintiff was limited to standing or walking for six hours in an eight-hour workday and sitting for the same. Like Dr. Sabourin's determination, Dr. Ross limited Plaintiff's ability to push and pull in line with Plaintiff's lift and carry limitations. (Id.) Posturally, Plaintiff was limited to frequently climbing, balancing, stooping, kneeling, crouching, and crawling. (A.R. 667.) Plaintiff's RFC included no manipulative, visual, communicative, or environmental limitations. (A.R. 667-68.)

C. Administrative Hearing

On May 26, 2011, ALJ Jerry F. Muskrat conducted a hearing to determine Plaintiff's disability claims. (A.R. 49-113.) Plaintiff appeared in person, represented by his partner Mary Edwards. (A.R. 49.) Medical Expert Dr. Kent Layton and Vocational Expert John Koucher also testified. (Id.)

///

### 1. Plaintiff's Testimony

Plaintiff testified that he was forty-five years old, obtained his GED, and had no vocational training. (A.R. 77-78.) Plaintiff testified that he has been incarcerated "off and on." (A.R. 79.) Plaintiff supported himself through food stamps, as he has not been working. (A.R. 80.) Plaintiff also testified that he had been incarcerated for a time since the alleged onset date of his disability, from December 2007 to September 2010. (Id.)

Plaintiff testified that in terms of mental health, he suffers from bipolar disorder, phobia, depression, paranoia, suicidal ideation, schizoaffective disorder, and obsessive compulsive disorder. (A.R. 83.) Additionally, Plaintiff indicated he has nerve damage to his right elbow and wrist, back pain, and is supposed to use a cane as a result of his once-broken right foot. (Id.) Plaintiff testified that although the break was in 2005, he still experienced "real bad" pain. (A.R. 83-84.) Plaintiff testified that he attempted suicide in February 2010 by hanging himself with a bed sheet while in prison. (A.R. 85.) He indicated that his OCD leads him to repeatedly clean something "to make sure it's clean." (A.R. 86-87.) Plaintiff testified that he was taking Klonopin for OCD, Risperdal to treat his schizophrenia and bipolar disorder, Mapap for the pain in his hand, arm, and back, and Prilosec for acid reflux. (A.R. 66-67, 71-74.)

When given the opportunity to supplement Plaintiff's testimony, Ms. Edwards indicated that Plaintiff is "very suicidal." (A.R. 88.) Ms. Edwards also indicated that Plaintiff was unable to be around people or talk to others, and that "he'll have outbreaks where if you bother him too much, then he may try to harm you." (Id.)

### 2. Medical Expert Testimony

Clinical Psychologist Dr. Kent Layton, Psy.D., testified regarding his analysis of the medical and psychological evidence. (A.R. 90-103.) Dr. Layton indicated that Plaintiff likely suffered from substance addiction disorder and that any hallucinations Plaintiff experienced are likely "a result of the large amount of amphetamines, crystal meth, [and] cocaine that [Plaintiff] used." (A.R. 91.) With respect to Plaintiff's claims of bipolar disorder, Dr. Layton pointed out that none of the evidence establishes that Plaintiff has ever

suffered a manic episode and therefore indicated that Plaintiff is not bipolar. (A.R. 92.) Dr. Layton testified that substance addiction disorder was likely the cause of Plaintiff's depression. (Id.)

Dr. Layton thoroughly reviewed Plaintiff's records and highlighted that at one point Plaintiff seemed more focused on how to get SSI benefits than committed to his treatment. (A.R. 92.) Also highlighted was the fact that after the alleged onset date of his disability, Plaintiff was being excused from mental health meetings so he could go to school. (Id.) Dr. Layton indicated that when looked at as a whole, the evidence shows that Plaintiff has some OCD traits, but not the disorder. (A.R. 93.)

Dr. Layton, with the help of the Social Security Administration's psychiatric review technique form, analyzed Plaintiff's impairments under listing 12.09 (substance addiction disorder) and 12.04 (affective disorder). (A.R. 94-95.) With respect to 12.04, Dr. Layton testified that Plaintiff exhibited, to some extent, psychomotor agitation, problems with concentrating or thinking, thoughts of suicide, delusions or paranoid thinking, hyperactivity, and easy distractibility. (A.R. 96.) Dr. Layton indicated that with respect to degree of limitation due to both 12.04 and 12.09, Plaintiff experienced a mild restriction of activities of daily living, moderate difficulty maintaining social functioning, moderate difficulty with maintaining concentration, persistence, and pace, and rare and brief episodes of decompensation that are not severe enough to result in a loss of adaptive functioning. (A.R. 97-98.) When asked if, in his expert opinion, Plaintiff's impairments meet a listing, Dr. Layton testified that he did not. (A.R. 98.)

Addressing Plaintiff's capacity to perform work functions, Dr. Layton testified that Plaintiff can have simple or complex tasks, minimum interaction with either the public or co-workers, and should have no problem with supervisors. (A.R. 98-99.) Dr. Layton also testified that should Plaintiff be found disabled, his condition would likely stabilize and improve with consistent medical treatment over the following eighteen months. (A.R. 99-100.)

///

10

16cv1735 - JLS (PCL)

### 3. Vocational Expert Testimony

Vocational expert John Koucher determined that Plaintiff had no past relevant work. (A.R. 104-106.) The ALJ proposed the following hypothetical to Mr. Koucher: a hypothetical individual limited to medium range work with postural limitations limiting him to frequent climbing, balancing, stooping, and crouching or crawling and mental limitations requiring him to work in a non-public environment with minimal contact with co-workers, has a high school education, no past relevant work, and is categorized as a younger individual. Mr. Koucher indicated that based solely on the exertional limitations as proposed, the hypothetical calls for a finding of not disabled. (A.R. 107.) Mr. Koucher also indicated that despite the slight erosion effect of the hypothetical's non-exertional limitations, there were a significant number of jobs that the hypothetical individual could perform including a hand packager, cleaner, and laundry worker. (A.R. 107-109.)

Ms. Edwards countered Mr. Koucher's testimony by asserting that Plaintiff would be unable to be a packager because Plaintiff's "is like completely gone." (A.R. 110-11.) Similarly, Ms. Edwards argued that Plaintiff would be unable to work as a laundry worker because he was unable to lift." (A.R. 111.)

## IV. ALJ DECISION

The ALJ sought to determine whether Plaintiff was disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. (A.R. 35.) The ALJ ruled that Plaintiff was not disabled as defined by the Act from June 5, 2007 through the date of his decision on July 6, 2011. (A.R. 32, 41.)

The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). (A.R. 32-48.) At step one, the ALJ found that Plaintiff's alleged disability onset date needed to be adjusted to June 5, 2007, and that Plaintiff had not engaged in substantial gainful activity since that date. (A.R. 36.) At step two, the ALJ found that Plaintiff had severe impairments of back pain; right elbow, hand and wrist impairment; nerve damage in the right elbow; GERD; status post right foot fracture; dysthymia or mood disorder NOS; and substance abuse (drugs), by history. (Id.) At step

three, the ALJ determined that none of Plaintiff's impairments or combination of impairments met or equaled any impairment listed in 20 CFR, Part 404, Subpt. P, App. 1 (the Listings). (A.R. 37.) The ALJ next determined that Plaintiff retained the RFC to lift or carry twenty-five pounds frequently and fifty pounds occasionally; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; is restricted to frequent climbing, balancing, stooping, kneeling, crouching, and crawling; and mentally limited to work with no public contact and minimal contact with co-workers. (A.R. 38.) The ALJ found that Plaintiff's subjective symptom testimony was not fully credible. (Id.) At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (Id.) Finally, at step five the ALJ found that considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff was capable of performing. (A.R. 40.) As a result of the five-step analysis, the ALJ concluded that Plaintiff was not disabled as defined by the Act. (A.R. 41.)

The ALJ weighed the evidence in Plaintiff's case as follows. The ALJ summarized Plaintiff's diagnoses from the medical record including chronic back pain, GERD, a ganglion cyst with decreased digit sensitivity following excision, irritation of the right arm's right antebrachial cutaneous nerve, post-right foot fracture, drug abuse history, and mood disorder NOS. (A.R. 36.) At the administrative hearing, Kent Layton, Psy.D. testified that Plaintiff suffered from dysthymia or mood disorder NOS and a history of drug abuse. Dr. Layton testified that the medical record showed evidence that Plaintiff's mood disorder was manifested as a depressive syndrome characterized by "psychomotor agitation, difficulty concentrating or thinking; thoughts of suicide; delusions or paranoid thinking as well as manic syndrome characterized by hyperactivity and easy distractibility." (A.R. 37.) The ALJ indicated that both he and the medical evidence as a whole concur with Dr. Layton's mood disorder and drug abuse diagnoses and as such, the ALJ adopted Dr. Layton's analysis. (Id.)

In determining that Plaintiff's medically determinable impairments do not meet or medically equal a listing, the ALJ discussed and analyzed both the medical expert testimony and Plaintiff's medical evidence. (A.R. 37-39.) First, the ALJ noted that while Plaintiff's mental impairments resulted in mild restrictions of the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, there were no episodes of decompensation. (A.R. 37.) The ALJ indicated that the medical evidence did not establish the presence of any "C" criteria of the Listings. (Id.)

In making his RFC determination, the ALJ considered all symptoms and the extent to which the symptoms were consistent with the objective medical and opinion evidence. (A.R. 38.) The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not fully credible. (Id.) The ALJ indicated that Plaintiff had been diagnosed with "rule out malingering of mental illness for secondary gain" and that he had not been compliant with his prescribed treatment protocol. (Id.) Further, the ALJ noted that Plaintiff was enrolled in and attending City College courses for music production five days a week during the alleged onset of his disability. (Id.) The ALJ also noted that in April 2008 Plaintiff told the consulting psychologist that he did not have an alcohol or drug problem, while throughout the rest of the record Plaintiff has spoken "volumes about his longstanding drug abuse since age 15." (Id.)

The ALJ discussed the severity and intensity of Plaintiff's medical treatment and indicated that the course of Plaintiff's treatment has been generally conservative despite claims that Plaintiff is totally disabled. (A.R. 39.) The medical evidence, as summarized by the ALJ, indicates that Plaintiff does not require any special accommodation to relieve pain or other symptoms and that despite Plaintiff's claims of disabling fatigue and weakness, Plaintiff does not exhibit significant atrophy, loss of strength, or difficulty moving that would be demonstrative of severe and disabling pain. (Id.) Further, the ALJ

13

reported that the objective evidence establishes that the prescribed medication has been effective in controlling Plaintiff's symptoms and that he has not alleged any side effects from the medication. (Id.)

In summarizing the medical evidence, the ALJ noted that there was no evidence of loss of weight or appetite due to pain or depression. (A.R. 39.) Similarly, there is no evidence of sleep deprivation or cognitive deficits due to pain or depression. (Id.) Ultimately, the ALJ reasoned that Plaintiff's claims of significant limitations are not supported by Plaintiff's own description of his daily activities noting that Plaintiff is able to cook, clean, shop, and do errands. (Id.)

Last, the ALJ noted that within the medical evidence, no physician has indicated that Plaintiff is totally disabled and precluded from all work and that Dr. Sabourin indicated Plaintiff was capable of performing medium exertional work with frequent postural limitations. (A.R. 39.)

## V. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) he suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. § 423 (d)(1)(A) (West 2004). An applicant must meet both requirements to be "disabled." Id.

### A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If

so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F. 3d 1094, 1098-99 (9th Cir. 1999).

### B. Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 2001); Desroisers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Id. (citation and quotations omitted). "A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A §405(g). This matter may also be remanded to the Social Security Administration for further proceedings. Id.

///

///

# VI. DISCUSSION

Plaintiff argues that he "meets and exceeds" the requirements to be awarded SSI benefits. (Doc. 25 at 2.) To support his contention, Plaintiff relies on the Americans with Disabilities Act ("ADA") and the California State Prisoner's Handbook. (Id. at 6.) Plaintiff does not contend that the ALJ made specific errors with regard to Plaintiff's credibility, evaluating the medical record, or weight given to the examining or consulting medical experts. (Doc. 25.) Defendant argues that neither the ADA nor Prisoner's Handbook are applicable as the Social Security Act has its own definition of disabled which is to be used to determine eligibility for benefits. (Doc. 26-1 at 4.)

"For purposes of the Social Security Act, a claimant is disabled if the claimant is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) citing 42 U.S.C. § 423(d)(1)(A). It is the providence of the ALJ to apply this standard to the medical evidence and where substantial evidence supports the ALJ's determination, there is no error. Schneider, 223 F.3d at 973.

Here, there is substantial medical evidence in the record to support the legal conclusion that Plaintiff is not disabled within the meaning of the Act. At no point in any of the medical evidence did a physician or psychologist indicate that Plaintiff was disabled and precluded from working. In fact, treating clinicians and doctors as well as the examining and consulting physicians all indicated that Plaintiff's impairments are mild and pose the most modest of limitations on Plaintiff's RFC. Medical experts determined that Plaintiff did not suffer from bipolar disorder as he claimed and additionally found that overall, Plaintiff's subjective complaints were disproportionate to the realities of his impairments.

To the extent that the ALJ was required to identify and weigh the evidence in the record, the ALJ noted that the evidence showed a conservative course of treatment that did

not become more intense to meet Plaintiff's claims of increased impairment. (A.R. 38-39.) Plaintiff received instructions to exercise his back to alleviate symptoms and the medical expert testified that Plaintiff's impairments were expected to improve with consistent treatment. Additionally, the medication recommended to Plaintiff for his impairments, such as naprosen, is a low-level over the counter drug. Were Plaintiff's back and arm impairments as significant as claimed, one would expect the record to reflect a more advanced course of treatment. While Plaintiff did have surgery on his wrist for a cyst excision, the examining physician indicated that Plaintiff was fully healed from surgery and no longer needed to wear a wrist splint.

Additionally, after reviewing the entire medical record, there is more than substantial evidence present to determine that Plaintiff is not disabled and totally precluded from all work. Along with the fact that no medical staff determined that Plaintiff was disabled, Plaintiff's own behavior indicates that Plaintiff has the capacity to work. First, the record indicates that Plaintiff was, after the disability onset date, attending City College as a full time student studying music production. Second, Plaintiff injured himself playing basketball. Plaintiff claims that his physical and mental impairments prevent him from working, but surely those same impairments would prevent him from full time coursework and recreation. At the very least, this establishes that Plaintiff's activities of daily living are not impacted by Plaintiff's impairments. This evidence also runs counter to Ms. Edwards' assertions at the hearing with respect to Plaintiff's ability to work with others. Coursework and basketball are both activities that generally include interactions with others. It is unlikely that Plaintiff was taking his full-time coursework alone, so the assumption is that Plaintiff would have to engage with others fairly regularly, and successfully, if he was to continue in his studies.

The medical record as a whole, including the records, reports from examining and consulting physicians, and expert testimony; when evaluated through the lens of the standard for determining disability, reveals that Plaintiff does not meet the definition of disabled as defined by the Social Security Act. This is strengthened by both the record and

17

testimony that indicates Plaintiff displayed more focus on obtaining SSI benefits than improving his mental health impairments and the likelihood that he was malingering for secondary gain. As such, the ALJ's determination is supported by substantial evidence and there is no error.

## VII. CONCLUSION

For the reasons set forth above, the Court recommends granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment.

This report and recommendation is submitted to the Honorable Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **July 12, 2017**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **July 26, 2017**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: June 27, 2017

Hon. Peter C. Lewis
United States Magistrate Judge